The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

Opinion Number: _____

Filing Date: November 7, 2022

**No. A-1-CA-38144**

**WELLS FARGO BANK N.A., as**
**Trustee for the Certificateholders**
**of Banc of America Alternative Loan**
**Trust 2003-8, Mortgage Pass-Through**
**Certificates, Series 2003-8,**

      Plaintiff-Appellee,

v.

**DAVID GRAHAM,**

      Defendant-Appellant,

**and**

**DARLENE E. GURULE and**
**PHOENIX MECHANICAL, L.L.C.,**

      Defendants.

**APPEAL FROM THE DISTRICT COURT OF TAOS COUNTY**
**Emilio J. Chavez, District Judge**

McCarthy & Holthus, LLP
Jason Bousliman
Albuquerque, NM

for Appellee

Law Offices of Brian A. Thomas, P.C.
Brian A. Thomas
Albuquerque, NM

for Appellant

**OPINION**

**WRAY, Judge.**

{1}     Defendant David Graham appeals the district court's grant of summary judgment in favor of Plaintiff Wells Fargo Bank, N.A. (the Bank) in this foreclosure action, relating to a mortgage (the 2003 Loan) taken out on property Defendant owns in Taos, New Mexico (the Property). Defendant contends that the 2003 Loan violates public policy and additionally that certain payments were not properly credited. We affirm.

**BACKGROUND**

{2}     Defendant first purchased the Property and obtained a mortgage in 1993. In 1999, he effectively refinanced the 1993 mortgage with a line of credit from Centinel Bank of Taos. The line of credit was modified and renewed in both 2000 and 2001. In late December 2002, Defendant applied for and received a "no document loan." According to his affidavit, Defendant applied for the "no document" loan to avoid having the lender verify his ability to repay the loan; instead, approval depended on whether his "equity and [his] credit score met the guidelines." Defendant used part of this loan to repay Centinel Bank of Taos, and "a substantial balance" of the remaining proceeds "was paid directly to [Defendant] in cash and was used to pay ongoing [business] operating expenses as well as to service [Defendant's] debt." Between June and August 2003, Defendant obtained the 2003 Loan, which is the

loan at issue in this case. The 2003 Loan was a second "no document" loan, and Defendant used the $294,000 to pay off the loan he had received six months prior.

{3} In October 2014, the Bank filed a complaint for foreclosure and alleged that Defendant had defaulted on the 2003 Loan. The Bank moved for summary judgment, which the district court granted. Defendant appeals.

## DISCUSSION

{4} Defendant argues that (1) the district court improperly granted summary judgment because the 2003 Loan is unenforceable as a matter of public policy based on statutory and equitable grounds; and (2) the district court incorrectly refused to credit a 2011 payment. We address each issue in turn.

## I. The Enforceability of the 2003 Loan

{5} Defendant argues that the 2003 Loan is unenforceable based on statutory policy statements and the Bank's unclean hands. The district court ruled that Defendant failed to legally or factually support these claims and granted summary judgment in favor of the Bank. "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Bank of N.Y. Mellon v. Lopes*, 2014-NMCA-097, ¶ 6, 336 P.3d 443 (internal quotation marks and citation omitted). For both arguments, Defendant contends that disputed facts should have prevented summary judgment, but ultimately acknowledges that the statutory policy argument turns on the existence of a public

2

policy—a question of law—and the unclean hands argument relies on unrebutted facts. Absent disputes of fact, we review de novo the grant of summary judgment. *See City of Albuquerque v. BPLW Architects & Eng'rs, Inc.*, 2009-NMCA-081, ¶ 7, 146 N.M. 717, 213 P.3d 1146 (observing that if the facts are undisputed, "and an appeal presents only a question of law, we apply de novo review"); *State Pub. Educ. Dep't v. Zuni Pub. Sch. Dist.*, 2018-NMSC-029, ¶¶ 16-17, 458 P.3d 362 (reviewing de novo summary judgment, questions of law, and statutory construction).

{6}      We first consider the Home Loan Protection Act (HLPA), NMSA 1978, §§ 58-21A-1 to -14 (2003, as amended through 2021),[1] and second turn to the doctrine of unclean hands.

**A.      The HLPA and New Mexico Public Policy**

{7}      Defendant maintains that he has a complete defense to foreclosure of the 2003 Loan because the Legislature's findings set forth in the HLPA established a public policy that the 2003 Loan violated and the 2003 Loan is therefore unenforceable. Generally, agreements are not void for public policy reasons "unless they are clearly contrary to what the [L]egislature or judicial decision has declared to be the public policy." *Berlangieri v. Running Elk Corp.*, 2002-NMCA-060, ¶ 11, 132 N.M. 332, 48 P.3d 70 (internal quotation marks and citation omitted). To evaluate whether an

---

[1] Even though the HPLA has been amended through 2021, in this opinion, we refer to the 2003 version of the HLPA, unless otherwise noted, because that is the version of the statute in effect at the time the 2003 Loan originated.

agreement is void for public policy, we consider whether the Legislature has declared a public policy, and if so, whether the 2003 Loan is clearly contrary to that public policy. *See DiGesu v. Weingardt*, 1978-NMSC-017, ¶ 7, 91 N.M. 441, 575 P.2d 950 ("Contracts in violation of the public policy of the state cannot be enforced."). Because we conclude that the Legislature did not intend for the HLPA's findings to apply to the 2003 Loan, we do not continue to consider further whether the terms of the 2003 Loan are clearly contrary to any policy set forth in the HLPA findings.

{8}	In 2003, our Legislature adopted the HLPA. *Bank of N.Y. v. Romero*, 2014-NMSC-007, ¶ 41, 320 P.3d 1. The HLPA includes, in relevant part, the following specific Legislative findings:

> A. abusive mortgage lending has become an increasing problem in New Mexico, exacerbating the loss of equity in homes and causing the number of foreclosures to increase in recent years;
>
> B. one of the most common forms of abusive lending is the making of loans that are equity-based, rather than income-based.

Section 58-21A-2(A), (B). Relying on Section 58-21A-2(A) and (B), Defendant contends, in part, that the HLPA establishes New Mexico's "explicit public policy," which he argues forms a defense to foreclosure of the 2003 Loan. The HLPA, however, did not bring every loan within its purview. When passing the HLPA, the Legislature, in Chapter 436, Section 19 of the New Mexico Laws of 2003, stated,

4

A. Except as provided in Subsection B of this section, the [HLPA] shall apply to all home loans made or entered into after January 1, 2004.

B. The effective date of the provisions of Section 10[2] of this act is July 1, 2003 and, on or after that date, no county or municipality shall enact or enforce any ordinance, resolution or rule regarding home loans that are subject to the [HLPA] or that, except for the delayed applicability date of Subsection A of this section, would otherwise be subject to that act.

Subsequently, the official annotations for Section 58-21A-2 set forth the following:

Effective dates. — Laws 2003, ch. 436 contains no effective date provision, but, pursuant to N.M. Const., art. IV, § 23, is effective June 20, 2003, 90 days after adjournment of the [L]egislature.

Applicability. — Laws 2003, ch. 436, § 19A makes the [HLPA] applicable to all home loans made or entered into after January 1, 2004.

Section 58-21A-2 annot. Citing the "Effective dates," Defendant maintains that the legislative findings are policies set forth in the HLPA that were in effect at the time the 2003 Loan originated. The Bank, however, argues that the Legislature did not intend for the 2003 Loan to be subject to the HLPA. We agree with the Bank. While the HLPA states a June 20, 2003 effective date, the Legislature used the applicability date to clarify the class of home loans to which the HLPA applies—thus explicitly narrowing the class to loans that were made or entered into after January 1, 2004. The 2003 Loan originated on July 29, 2003, before the January 1, 2004 applicability date for the category of loans that the Legislature made subject to the HLPA. The

_____

[2]Section 10 refers to Section 58-21A-10, the HLPA provision addressing the preemption of conflicting county or municipal ordinances.

5

2003 Loan is therefore not subject to the HLPA. We remain unpersuaded by Defendant's arguments to the contrary and explain.

{9} Defendant constructs the case for the application of the HLPA's public policy as follows. According to Defendant, the different "Effective" and "Applicable" dates render the HLPA ambiguous. While the Legislature affirmatively stated that the HLPA "*shall* apply to all home loans made or entered into after January 1, 2004," 2003 N.M. Laws, ch. 436, § 19(A) (emphasis added), and Defendant acknowledges as much, he nevertheless maintains that the Legislature did not "declare the inverse, that it does *not* apply to earlier-made loans and in what context." Defendant next argues that to follow the Legislature's direction to liberally construe the HLPA "to carry out its purpose," *see* § 58-21A-14, this Court should liberally construe the HLPA in a manner "that is most consonant with the legislative purpose and the general protections[] of the statute." Defendant additionally contends that the Legislature would not have delayed the implementation of the HLPA's policies to remediate abusive lending, because the HLPA's public policy arose out of the earlier-enacted Unfair Practices Act (UPA), NMSA 1978, §§ 57-12-1 to -26 (1967, as amended through 2019). To summarize, Defendant asserts that "[t]o conclude that the Legislature intended the opposite of its declared public policy[] for all loans prior to January 1, 2004, and then to diametrically reverse its policy on January 1, 2004, defies logic" and would permit prohibited "subterfuge."

6

{10} Defendant's construction of the HLPA fails to consider the statute as a whole. *See Brenneman v. Bd. of Regents of Univ. of N.M.*, 2004-NMCA-003, ¶ 10, 135 N.M. 68, 84 P.3d 685 (construing a statute as a whole). Defendant insists that because the HLPA was effective when the 2003 Loan originated, the policies expressed therein must apply to the 2003 Loan in order to accomplish the Legislature's intent. This view, however, is blind to the full scope of the Legislature's intent when enacted the HLPA. The Legislature pragmatically implemented the HLPA to provide clarity for which loans would be subject to the statute and give lenders time to adjust their practices and in this manner, was able to address the policy problem of the increasingly abusive lending environment while also limiting the class of loans that would be subject to the HLPA and creating a specific remedy. *See* § 58-21A-2 (policy); § 58-21A-4 (prohibited practices); § 58-21A-5 (more prohibited practices); § 58-21A-9 (civil action). The applicable date, rather than creating an ambiguity, narrows the class of loans subject to the HLPA. *See Cabazos v. Calloway Constr.*, 1994-NMCA-091, ¶ 7, 118 N.M. 198, 879 P.2d 1217 (noting that, "if a statute is not ambiguous, there is no reason to resort to principles of construction or considerations of policy"). The 2003 Loan originated before January 1, 2004, and as a result, the 2003 Loan is not subject to the legislative findings set forth in the HLPA.

{11} The Legislature anticipated that some loans would not be subject to the HLPA. In establishing a separate effective date for Section 58-21A-10 of the HLPA, the

preemption provision, the Legislature noted that some loans would be "subject to the [HLPA]" and that some loans would otherwise be subject to the HLPA "except for the delayed applicability date." 2003 N.M. Laws, ch. 436, § 19(B). The 2003 Loan was a loan that would otherwise be subject to the HLPA, "except for the delayed applicability date." *See id.*

{12}     In relation to those loans that are subject to the HLPA, the Legislature expressed a new public policy related to specified abusive lending practices, contrary to Defendant's argument that the HLPA simply expanded UPA policies. The HLPA expresses the Legislature's finding that "abusive mortgage lending *has become* an *increasing* problem in New Mexico," Section 58-21A-2(A) (emphases added), and our Supreme Court explained that the "Legislature passed the HLPA in 2003 to combat abusive home mortgage procurement practices." *Romero*, 2014-NMSC-007, ¶ 41. The UPA, however, broadly addresses "unconscionable and unfair or deceptive trade practices." *State ex rel. Stratton v. Gurley Motor Co.*, 1987-NMCA-063, ¶ 8, 105 N.M. 803, 737 P.2d 1180. While the HLPA explicitly establishes that violations of the HLPA also constitute UPA violations, *see* § 58-21A-12, we are unpersuaded that "[t]he public policy expressed in [the] HLPA was supplementary" to the UPA, as Defendant argues.

{13}     For these reasons, we conclude that the 2003 Loan was not in the class of loans the Legislature intended to be subject to the HLPA. We reject the notion that

8

the HLPA's legislative findings could form the basis to void an agreement when the agreement was not subject to the HLPA. Because we discern no other applicable public policy, we do not further consider Defendant's arguments that the HLPA provides a defense to enforcing the 2003 Loan.

**B.      Unclean Hands**

{14}      Defendant additionally argues that the 2003 Loan is unenforceable based on the equitable doctrine of unclean hands and that the unclean hands claim was based on asserted facts that the Bank had failed to rebut. "The question of whether, on a particular set of facts, the district court is permitted to exercise its equitable powers is a question of law, while the issue of how the district court uses its equitable powers to provide an appropriate remedy is reviewed only for abuse of discretion." *Romero v. Bank of Sw.*, 2003-NMCA-124, ¶ 28, 135 N.M. 1, 83 P.3d 288 (internal quotation marks and citation omitted). Under the doctrine of unclean hands, a complainant may not recover "where he or she has been guilty of fraudulent, illegal or inequitable conduct in the matter with relation to which he or she seeks relief." *Randles v. Hanson*, 2011-NMCA-059, ¶ 21, 150 N.M. 362, 258 P.3d 1154 (alteration, internal quotation marks, and citation omitted). Specifically, the doctrine applies "in circumstances where the complainant has dirtied his or her hands in acquiring the right he or she now asserts." *Id.* (alterations, internal quotation marks, and citation omitted). Defendant maintains that the Bank dirtied its hands by approving an

9

equity-based loan with no investigation into Defendant's assets and ability to pay, and therefore, the 2003 Loan is unenforceable. Under the circumstances of this case, we cannot conclude the district court abused its discretion in rejecting Defendant's unclean hands argument.[3]

{15}     The undisputed facts before the district court created no material issue of fact to support equitable relief based on "fraudulent, illegal or inequitable conduct" by the Bank in originating the 2003 Loan. *See id.* (internal quotation marks and citation omitted). To the contrary, Defendant's testimony demonstrates that he understood the terms of the loan and purposefully sought the loan because its equity-based terms were the only terms available to him in his situation. In his affidavit in response to Plaintiff's motion for summary judgment, Defendant testified that in 2002, he was advised "due to the sporadic nature of my income and because my debt-to-income ratio fell outside of the recommended guidelines, I would not likely qualify for a mortgage loan using traditional underwriting criteria." Defendant also testified that he was told about a "no document loan" that "was available to self-employed people like [him], who were unable to document a steady net income sufficient to repay the loan after servicing other existing debt." Defendant understood that "the loan would be approved if [his] equity and . . . credit score met the guidelines" and further that

---

[3] We assume without deciding that the doctrine of unclean hands can be applied in a situation in which the right to be enforced was secured by one party and later assigned to another.

10

"this 'no document' loan process was the only option [he] had to get a long-term loan and mortgage approved at that time. By using this method, the bank would never directly evaluate whether [he] had the financial ability to repay the loan." With this understanding, on the 2003 Loan application, Defendant reported his high business income, low personal expenses, and high net worth, as well as ownership of several properties and high-dollar assets. Later, however, in his affidavit, Defendant explained that the 2003 Loan application was not an accurate picture of his debt-to-income ratio, having omitted his business expenses and some additional debt. Defendant's evidence does not support fraudulent, inequitable, or illegal conduct by the Bank.

{16} The undisputed evidence demonstrates that terms of the 2003 Loan were not concealed and Defendant was not misled. Defendant understood those terms, and he purposefully selected those terms in order to obtain the financing he desired. *See Wyrsch v. Milke*, 1978-NMCA-085, ¶ 32, 92 N.M. 217, 585 P.2d 1098 ("He who seeks equity must do equity." (internal quotation marks and citation omitted)). Under these circumstances, the district court did not abuse its discretion to reject Defendant's equitable defense and grant summary judgment to the Bank.

## II.    The Partial Payment

{17} Last, Defendant contends that the district court improperly failed to credit a payment submitted by Defendant to the Bank on September 1, 2011. The Bank

asserts that Defendant failed to preserve or waived this argument, the 2011 payment was made after default, and the Bank was not obligated to accept it. In reply, Defendant maintains that the 2011 payment was rejected well before March 1, 2014, "the effective date of default." We conclude that Defendant preserved and did not waive the issue but did not "tender" a payment in September 2011.

**{18}** Regarding preservation, an issue is preserved for our review if "a ruling or decision by the trial court was fairly invoked." Rule 12-321(A) NMRA. The Bank does not dispute that Defendant raised the question in the district court in response to summary judgment. Accordingly, the issue was preserved. The Bank additionally argues that under Rule 1-008 NMRA, Defendant waived the issue by failing "to plead partial tender" as an affirmative defense in a responsive pleading. Rule 1-008(C) requires a party to plead affirmative defenses, including "accord and satisfaction, arbitration and award, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver and any other matter constituting an avoidance or affirmative defense." The Bank does not explain which of these defenses "partial tender" invokes or otherwise how Rule 1-008 applies to the argument Defendant made. We therefore consider the Bank's waiver argument no further and turn to the merits of Defendant's tender argument.

12

{19}    Defendant appears to concede that the 2011 payment was a partial payment. The record appears to support this concession. Payment records show that payment for August 2011 was not made until October 2011. The September 2011 payment was for a single month, but an outstanding balance existed at that time, resulting in an additional required payment to bring the account current. This discrepancy explains the Bank's communication dated September 27, 2011, stating that "[b]ecause the payment we received was less than the total amount required for the payment, we are returning this check to you."

{20}    Defendant argues that the district court's failure to credit the September 2011 payment resulted in "an erroneous application of the Uniform Commercial Code" (UCC). Specifically, Defendant contends that he "tendered" the funds in September 2011, and regardless of whether the Bank rejected the "tender," the UCC required the Bank to discharge the tendered portion of the debt, reduce the balance of the debt, and stop accrual of interest on the debt. Defendant contends that because the UCC does not require a tender to be "in the full amount of the debt," the Bank could not reject the September 2011 payment without consequence. According to Defendant, the failure to credit a partial payment amounts to a prohibited prepayment penalty. The Bank responds that the UCC permits parties to "override" UCC provisions by agreement and that under the 2003 Loan agreement, the Bank was permitted to reject partial payments. We agree with the Bank.

13

{21} The UCC directs that "[t]he parties, by agreement, may determine the standards by which the performance of those obligations is to be measured if those standards are not manifestly unreasonable." NMSA 1978, § 55-1-302(b) (2005).[4] The note in the present case identifies the amount of the monthly payment and states that the borrower would be in default if he did not pay "the full amount of each monthly payment on the date it is due." The mortgage permits the Bank to "return any payment or partial payment if the payment or partial payments [were] insufficient to bring the [l]oan current." A tender, according to Defendant, "is an offer to perform coupled with the present ability of immediate performance, so that the obligation could be satisfied but for the other party's refusal to cooperate." *Miller v. Johnson*, 1998-NMCA-059, ¶ 21, 125 N.M. 175, 958 P.2d 745. According to the parties' agreement, the 2011 partial payment was not a tender, because even if the Bank had accepted the payment, it would not have satisfied Defendant's obligation for the month—the loan would not have been brought current. The 2011 partial

---

[4]The parties cite the current version of the statute, which includes essentially the same language as the statute in effect at the time the 2003 Loan originated. *See* NMSA 1978, § 55-1-102(3) (1961) ("The effect of provisions of this act may be varied by agreement, except as otherwise provided in this act and except that the obligations of good faith, diligence, reasonableness and care prescribed by this act may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.").

payment was therefore not a tender, and Defendant was not entitled to credit for the payment.

**CONCLUSION**

{22}    For the reasons stated herein, we affirm.

{23}    **IT IS SO ORDERED.**


_____
**KATHERINE A. WRAY, Judge**

**WE CONCUR:**


_____
**ZACHARY A. IVES, Judge**


_____
**MICHAEL D. BUSTAMANTE, Judge, retired, sitting by designation**

15